[No. A094917. First Dist., Div. One. Oct. 24, 2002.]

WATERKEEPERS NORTHERN CALIFORNIA et al., Plaintiffs and Appellants, v.
STATE WATER RESOURCES CONTROL BOARD, Defendant and Respondent;
REGIONAL WATER QUALITY CONTROL BOARDS FOR REGIONS 1 THROUGH 9, Real Parties in Interest and Respondents;
WESTERN STATES PETROLEUM ASSOCIATION et al., Interveners and Respondents.

## COUNSEL

Earthjustice Legal Defense Fund, Laura L. Hoehn, Michael R. Sherwood, Michael R. Lozeau; Lawyers for Clean Water, Daniel G. Cooper and Layne K. Friedrich for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Clifford T. Lee and Gavin G. McCabe, Deputy Attorneys General, for Defendant and Respondent and Real Parties in Interest and Respondents.

Pillsbury Winthrop, Margaret Rosegay and Norman F. Carlin for Intervener and Respondent Western States Petroleum Association.

Fulbright & Jaworski, Colin Lennard, Patricia J. Chen; and Roberta L. Larson for Intervener and Respondent California Association of Sanitation Agencies.

## OPINION

**SWAGER, J.**—In this appeal, we review an aspect of a petition for writ of mandate and complaint for injunctive and declaratory relief brought by six environmental organizations (appellants)[1] against the State Water Resources Control Board (State Board), each of the nine regional water quality control boards (Regional Boards) and two trade organizations[2] that intervened in the litigation on behalf of the State Board and Regional Boards. We affirm the judgment denying the petition and dismissing the complaint by adopting a narrow interpretation of the provision at issue.

### PROCEDURAL BACKGROUND

The appellants' original petition and complaint raised a series of nine challenges to the Policy for Implementation of Toxics Standards for Inland Surface Waters, Enclosed Bays, and Estuaries of California (hereafter Toxics Standards Implementation Policy) adopted by the State Board on March 2, 2000. The trial court entered a judgment for the defendants denying all of appellants' claims and awarding costs to the defendants. In their opening brief in this appeal, appellants advanced assignments of error related to four separate elements of the Toxics Standards Implementation Policy.

While the appeal was pending, the United States Environmental Protection Agency (EPA) reviewed the request of the State Board for approval of the Toxics Standards Implementation Policy. In a letter dated May 1, 2001, the EPA addressed and generally approved three of the four provisions at issue in the appeal. Following the State Board's response to the letter, appellants filed a partial voluntary dismissal pursuant to a stipulation with the parties in which they abandoned the three assignments of error addressed in the EPA letter, leaving for our review the one remaining assignment of error relating to the "minimum level" provision in section 2.4.5, paragraph 1, of the Toxics Standards Implementation Policy.

### DISCUSSION

A. *General Statutory Background*

The case arises from an administrative history reflecting the dual role of state agencies in implementing state law relating to water quality and

---

[1] WaterKeepers Northern California, Santa Barbara ChannelKeeper, Santa Monica Bay-Keeper, Orange County CoastKeeper, San Diego BayKeeper, and Heal the Bay.

[2] Western States Petroleum Association and California Association of Sanitation Agencies.

carrying out a delegated administrative responsibility over the more precise and far-reaching system of federal law. The governing state law, the Porter-Cologne Water Quality Control Act (Porter-Cologne Act),[3] enacted in 1969, assigns to the Regional Boards the responsibility of developing water quality control plans, or basin plans, which identify "beneficial uses of water" and set "water quality objectives." (Wat. Code, §§ 13241-13242.) The State Board is charged with approving these regional water quality control plans (Wat. Code, § 13245) and formulating "[s]tate policy for water quality" that conforms to the requirements of Water Code section 13142. The adoption of the state policy is a quasi-legislative, rulemaking action subject to review by the Office of Administrative Law under the Administrative Procedure Act. (Gov. Code, §§ 11340, 11353 & 11370.)

The actual administration of the Porter-Cologne Act rests on the power of the Regional Boards to prescribe waste discharge requirements for all persons discharging waste into inland surface waters, enclosed bays and estuaries within their jurisdiction. (Wat. Code, § 13263.) The waste discharge requirements implement state policy and water quality objectives formulated in basin plans. (Wat. Code, §§ 13241, 13263, subd. (a).) All persons subject to waste discharge requirements must file discharge reports with the Regional Boards containing prescribed information. (Wat. Code, § 13260; see also Wat. Code, § 13267; Cal. Code Regs., tit. 23, § 2200 et seq.)

Through the enactment in 1972 of the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), commonly known as the Clean Water Act, Congress delegated to those states with approved water quality programs the authority to issue permits to discharge pollutants under the National Pollutant Discharge Elimination System (NPDES). In response, the California Legislature amended the Porter-Cologne Act to require the State Board and Regional Boards to issue discharge permits that ensure compliance with the Clean Water Act. (See Wat. Code, § 13370 et seq.) The EPA subsequently gave the State Board and Regional Boards the required approval to issue NPDES permits. Hence, the waste discharge requirements issued by Regional Boards ordinarily also serve as NPDES permits under federal law. (Wat. Code, § 13374.)

In general, the Clean Water Act prohibits the discharge of any pollutant except in compliance with one of several statutory exceptions. (33 U.S.C. § 1311(a).) The most important of these exceptions (which largely incorporates by reference the others) applies to discharges subject to an NPDES permit. (33 U.S.C. § 1342.) NPDES permits "generally have five components: technology-based limitations, water quality-based limitations, monitoring and reporting requirements, standard conditions, and special conditions." (ABA Section of Natural Resources, Energy, and Environmental

---

[3]Water Code section 13000 et seq.

Law, The Clean Water Act Handbook (Evans edit., 1994) p. 14 (hereafter Clean Water Act Handbook).) Only the water quality-based limitations and monitoring and reporting requirements are at issue in this appeal.

NPDES permits require dischargers to monitor their discharges according to prescribed procedures and to report the results on discharge monitoring reports. (33 U.S.C. § 1318(a); 40 C.F.R. § 122.41(*l*)(4) (2002).) Monitoring is ordinarily conducted at the point of discharge, though monitoring of internal streams in a facility may occasionally be required. (40 C.F.R. § 122.45(h) (2002).)[4] Discharge monitoring reports are admissible in court as admissions of the discharger and thus play a critical evidentiary role in enforcement actions for violation of permit terms.[5]

The Clean Water Act authorizes both a chemical-specific and a whole-effluent approach to regulation of toxic pollutants. The former relies on chemical analysis of discharge samples and the latter on tests of the toxicity of the entire discharge sample. (See Clean Water Act Handbook, *supra,* pp. 28-32.) Only the chemical-specific approach is at issue here. Three provisions in the Clean Water Act—sections 304, 307 and 303—are of particular importance in the chemical-specific regulation of toxic pollutants.

Section 304(a) of the Clean Water Act directs the EPA to "develop and publish . . . criteria for water quality accurately reflecting the latest scientific knowledge . . . on the kind and extent of all identifiable effects on health and welfare . . . which may be expected from the presence of pollutants in any body of water . . . ."[6] (33 U.S.C. § 1314(a)(1).) The publications relating to water quality criteria published under section 304 are scientific assessments that lack the force of regulatory law, but, as we will see, they form the basis for state regulation of toxic pollutants under section 303.

Section 307(a)(1) of the Clean Water Act requires the EPA to compile a list of toxic pollutants that are to be subject to effluent limitations. (33 U.S.C. § 1317; 40 C.F.R. § 401.15 (2001).) The EPA has interpreted the list to include 126 priority pollutants. (40 C.F.R. § 423, appen. A (2001); see also *id.,* § 131.36, General Notes 1 (2002).)

[4]See also Toxics Standards Implementation Policy, page 11.
[5]*Sierra Club v. Union Oil Co. of California* (9th Cir. 1987) 813 F.2d 1480, judgment vacated and cause remanded on other grounds, *Union Oil Company of California v. Sierra Club* (1988) 485 U.S. 931 [108 S.Ct. 1102, 99 L.Ed.2d 264], reinstated and remanded, *Sierra Club v. Union Oil Co. of California* (9th Cir. 1988) 853 F.2d 667.
[6]The use of the term "criteria" in section 304(a) must be distinguished from "ambient criteria," i.e., "those water quality criteria that protect the designated use" of a body of water. (40 C.F.R. § 131.11(a)(1) (2002).)

The provision most central to this appeal, section 303(c)(2)(B), was added to the Clean Water Act by the Water Quality Act of 1987. (Pub.L. No. 100-4, § 1 (Feb. 4, 1987) 101 Stat. 7.) It requires the states to adopt specific numerical criteria for all toxic pollutants listed pursuant to section 307(a)(1), for which the EPA has published water quality criteria pursuant to section 304(a), where the discharge of the pollutants could reasonably be expected to interfere with the uses of the affected waters as designated by the states. (33 U.S.C. § 1313(c)(2)(B).) Upon adoption by the states, the numerical criteria for toxic pollutants are reviewed by the EPA. If the EPA determines that the state standard is not consistent with the requirements of federal law, it must notify the states and specify "the changes to meet such requirements." (33 U.S.C. § 1313(c)(3).) In the default of appropriate state action, the EPA itself must promulgate regulations establishing the required numerical standard for toxic pollutants. (33 U.S.C. § 1313(c)(3) & (4).) The present appeal concerns two such regulations promulgated by the EPA in the absence of state action.

To comply with section 303(c)(2)(B) of the Clean Water Act, California adopted an Enclosed Bays and Estuaries Plan and an Inland Surface Waters Plan. On November 6, 1991, the EPA approved both plans with certain exceptions relating particularly to the criteria for selenium.[7] Because EPA approval was not complete, California was included in a regulation known as the National Toxics Rule, intended to remedy noncompliance with the statute, promulgated on December 22, 1992, and later amended.[8] The preamble to the National Toxics Rule states: "This rule promulgates for 14 states, the chemical-specific, numeric criteria for priority toxic pollutants necessary to bring all states into compliance with the requirements of section 303(c)(2)(B)."[9] The rule sets forth a small set of criteria applicable specifically to California. (40 C.F.R. § 131.36(d)(10) (2002).)

In July 1994, the Superior Court of Sacramento County upheld a challenge to the Enclosed Bays and Estuaries Plan and the Inland Surface Waters Plan. In compliance with court order, the State Board formally rescinded the plans on September 22, 1994, leaving the state without any comprehensive regulatory compliance with section 303(2)(c)(B) of the Clean Water Act. The only regulatory law complying with section 303(c)(2)(B) consisted of the limited set of regulations in the National Toxics Rule and an unsystematic

---

[7] 57 Federal Register 60848, 60898 (Dec. 22, 1992).
[8] 65 Federal Register 31682, 31684 and 31685 (May 18, 2000).
[9] 57 Federal Register 60848 (Dec. 22, 1992).

treatment of toxic pollutants in the water-quality objectives of the basin plans of Regional Boards.[10]

To bring California into compliance with section 303(c)(2)(B) of the Clean Water Act, the EPA published on August 5, 1997, a proposed regulation establishing a comprehensive set of numeric criteria for priority toxic pollutants, known as the California Toxics Rule. After receiving comments, the EPA promulgated a final rule on May 18, 2000. (40 C.F.R. § 131.38 (2002).)

Federal regulations authorized the State Board to adopt policies, subject to EPA approval, affecting the "application and implementation" of water quality standards. (40 C.F.R. § 131.13 (2002).) Under this authority, the State Board drafted the Toxics Standards Implementation Policy to establish comprehensive, statewide implementation procedures for priority pollutant criteria contained in the California Toxics Rule, the National Toxics Rule as amended, and relevant water quality objectives in the basin plans of the Regional Boards. The draft policy was circulated for public review together with a "Functional Equivalent Document" (FED) containing a much more detailed technical explanation of the policy. The State Board resolution adopted March 2, 2000, approved both the Toxics Standards Implementation Policy and the accompanying FED.

B. *The Minimum Level Provision*

The issue before us concerns the portion of the Toxics Standards Implementation Policy governing the use of the concept of minimum level or ML in compliance determinations. The chemical-specific effluent limitations for priority toxic pollutants are sometimes set at levels that are too low to be detected in discharge samples by routine analytical chemistry methods. As the FED explains, "This often occurs when the pollutant is highly toxic or has a tendency to bioaccumulate in the environment." Federal regulations "require that any discharge that has the 'reasonable potential' to exceed the State water quality objective must contain an effluent limitation for that pollutant. The Clean Water Act makes no exception to this, even when technological limits prevent the quantification of the pollutant."

To deal with the difficult compliance problems arising when effluent limitations for toxic pollutants in discharge samples are below routine analytical chemistry methods of detection, the Toxics Standards Implementation Policy and FED employ the concepts of method detection level and ML for compliance reporting. In general terms, the method detection limit

---

[10]65 Federal Register 31682, 31685 (May 18, 2000).

(MDL) is the minimum concentration of a pollutant in a discharge that can be detected with 99 percent certainty by analysis of a discharge sample.[11] As the amount of a pollutant in a discharge sample decreases toward the MDL, the level of certainty that can be achieved in measuring the concentration of the pollutant decreases. The ML is the lowest level of concentration in a sample that can be accurately quantified.

Though the EPA has used the ML concept for over 10 years, the State Board adopted its own method of determining ML values based on a survey of state-certified analytical laboratories in California in 1997 and 1998. Appendix 4 to the Toxics Standards Implementation Policy sets forth specific ML's for the entire list of priority toxic pollutants. The FED explains, "The present list of ML's represents the 20th percentile of the reported lowest concentrations of a pollutant that can be quantitatively measured given the current state of performance in analytical chemistry methods in California. [The State Board] staff intend to update this list as existing methods are improved and as new methods are promulgated."[12]

The Toxics Standards Implementation Policy provides that the State Board "shall require in the permit that the discharger shall report with each sample result" the applicable ML and MDL. Dischargers are required to report as measured only sample results equal to or greater than the ML. If the sample results are less than the reported ML but greater than or equal to the MDL, they must report the results as " 'Detected, but Not Quantified' or DNQ" and provide an estimate of the chemical concentration with a numerical evaluation of the data quality (e.g., an estimated accuracy plus or minus a given percentage of the reported value). If the sample results are less than the MDL, dischargers may report the results as " 'Not Detected' or ND."

Where there is evidence that the priority toxic pollutant is present in the effluent above the effluent limitation and the sample results yield a DNQ or ND value, the Regional Boards have discretion to order dischargers to adopt a Pollutant Minimization Program directed at preventing or minimizing the

---

[11]The EPA has established standard technical procedures for determining the MDL in 40 Code of Federal Regulations part 136, appendix B, which were incorporated in the 1999 amendment to the Water Quality Control Plan for Ocean Waters of California. (See Toxics Standards Implementation Policy, § 2.4.1.)

[12]Appendix 4, page 1 similarly notes that the ML's are based on data for priority pollutants provided by state laboratories and states: "These ML's shall be used until new values are adopted by the [State Board] and become effective."

occurrence of the toxic pollutant in processes preceding the actual discharge.[13] This goal of pollutant prevention may, for example, be pursued by "input change, operational improvement, production process change, and product reformulation."[14]

## C. *Use of ML's in Permits*

While appellants raise no objection to the use of ML's in the reporting of or as a trigger for adoption of Pollutant Minimization Programs, they challenge inclusion of specific ML values in the permit itself and, in particular, attack the role of ML's in compliance determinations under paragraph 1 of section 2.4.5 of the Toxics Standards Implementation Policy, which provides: "Dischargers shall be deemed out of compliance with an effluent limitation if the concentration of the priority pollutant in the monitoring sample is greater than the effluent limitation *and* greater than or equal to the reported ML." (Italics added.) They claim that section 2.4.5 effectively employs the ML value as a substitute, or alternative, for the effluent limitation in compliance determinations, thereby causing the ML to supplant the effluent limitation where the effluent limitation is lower than the ML. They express the fear that, by including ML's in the permit, the provision "locks in for the life of the permit . . . the level of detection technology available on the date the permit was issued," and blocks the enforcement of those effluent limitations that are lower than the specified ML level, both in administrative enforcement proceedings and citizens' suits, even though the effluent limitations may be mandated by statute and properly promulgated regulations.

The state respondents maintain that the Toxics Standards Implementation Policy is entitled to the deferential standard of review accorded to quasi-legislative rules since the Legislature has given the State Board rulemaking power under Water Code section 13140. They cite *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 702 [166 Cal.Rptr. 331, 613 P.2d 579], where the California Supreme Court observed, " 'A reviewing court does not superimpose its own policy judgment upon a quasi-legislative agency in the absence of an arbitrary decision; . . . in these technical matters requiring the assistance of experts and the collection and study of statistical data, courts let administrative boards and officers work out their problems with as little judicial interference as possible.' " (See also *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10-11 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; *Western Oil & Gas Assn. v. Air Resources Board* (1984) 37

---

[13]Toxics Standards Implementation Policy, pages 25-26.
[14]Toxics Standards Implementation Policy, appendix 1, page 4.

Cal.3d 502, 509 [208 Cal.Rptr. 850, 691 P.2d 606].) Moreover, they note that under the United States Supreme Court decision in *Chevron U. S. A. v. Natural Res. Def. Council* (1984) 467 U.S. 837, 843 [104 S.Ct. 2778, 2782, 81 L.Ed.2d 694], the courts should not impose their own construction on an ambiguous statute that has been subject to administrative interpretation but rather should inquire "whether the agency's answer is based on a permissible construction of the statute."

On the present record, however, we do not find the principle of judicial deference to quasi-legislative acts to be helpful in resolving the issues on appeal. First, as discussed more fully later in this opinion, we find section 2.4.5 of the Toxics Standards Implementation Policy to be ambiguous. Since the record discloses no history of administrative interpretation of this newly enacted provision, the *Chevron* principle of deference to administrative interpretation finds no application to resolution of the ambiguity presented by the language of the provision. Second, in their reply brief appellants question the authority under the Porter-Cologne Act for an expansive interpretation of section 2.4.5. This is an issue that we must review de novo. ■ As stated in *Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at page 11, footnote 4, "A court does not . . . defer to an agency's view when deciding whether a regulation lies within the scope of the authority delegated by the Legislature. The court, not the agency, has 'final responsibility for the interpretation of the law' under which the regulation was issued. [Citations.]" (See also *California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 11-12 [270 Cal.Rptr. 796, 793 P.2d 2].)

■ Third, while we recognize that the EPA's administrative interpretation is relevant to interpretation of the Toxics Standards Implementation Policy in light of the State Board's obligation to carry out the objectives of federal law (e.g., Wat. Code, § 13372), the EPA's failure to address the ML provision in its letter of May 1, 2001, does not provide any clear indication of its administrative interpretation, though it may perhaps be regarded as signifying an absence of objections. Turning to the administrative history, we find a history of administrative interpretation that has shifted from a position supporting the respondents to a position closer to that of the appellants, without providing any clear and controlling guidance.

As noted in the FED, an EPA technical study issued in March 1991, entitled "Technical Support Document for Water Quality-based Toxics Control," recommends reliance on the ML in compliance determinations where the ML exceeds the effluent limitation. The study was issued under section

304 of the Clean Water Act and lacks the status of a regulation. The pertinent language of the EPA study states at page 111: "For most NPDES permitting situations, EPA recommends that the compliance level be defined in the permit as the minimum level (ML). The ML is the level at which the entire analytical system gives recognizable mass spectra and acceptable calibration points."

Four years later, the EPA revisited the ML concept in Water Quality Guidance for the Great Lakes System[15] (Great Lakes Guidance) and the accompanying supplementary information document included in the administrative record for this appeal. The supplementary information document explained that "the WQBEL [water quality-based effluent limits] as actually calculated is the enforceable permit limit even if it is below the minimum quantification level." Nevertheless "the analytical method and minimum quantification level is to be specified in the permit" for the purpose of assuring consistency in "reporting monitoring information." The regulation itself states that the permitting authority "shall designate as the limit in the NPDES permit the WQBEL exactly as calculated" but shall specify the analytical method to be used for monitoring and "the quantification level that can be achieved by use of the specified analytical method." The regulation continues: "The permit shall state that, for the purpose of compliance assessment, the analytical method specified in the permit shall be used to monitor the amount of pollutant in an effluent down to the quantification level." (40 C.F.R. § 132, appen. F, procedure 8 (2002).)

Following the Great Lakes Guidance, the preamble to the California Toxics Rule states: "EPA is aware that the criteria promulgated today for some of the priority toxic pollutants are at concentrations less than EPA's current analytical detection limits. Analytical detection limits have never been an acceptable basis for setting water quality criteria since they are not related to actual environmental impacts." The preamble notes, however, the utility of analytical detection limits in assessing compliance: "EPA does believe . . . that the use of analytical detection limits are [sic] appropriate for assessing *compliance* with National Pollutant Discharge Elimination System (NPDES) permit limits. . . . EPA . . . recommends the use of the 'minimum level' or ML for reporting sample results to assess compliance with WQBELs [citation]." (65 Fed.Reg. 31682, 31701 (May 18, 2000).)

We are unable to distill any useful guidance from this administrative history. Any inference favoring the use of ML's in compliance determinations that might be drawn from the EPA's letter of May 1, 2001, and the

---

[15]60 Federal Register 15366 (Mar. 23, 1995).

1991 technical study must be balanced against the discussion of the subject in the Great Lakes Guidance and the preamble to the California Toxics Rule. Accordingly, we will conduct an independent review of the provision.

We begin by observing that paragraph 1 of section 2.4.5 of the Toxics Standards Implementation Policy is ambiguous. Viewed in isolation, the provision appears to give ML's the same legal effect as the effluent limitations in the permit where the ML is higher than the effluent limitation. We see compelling reasons, however, to construe the provision more narrowly in order to give ML's effect only for the purpose of defining reporting requirements and providing a guideline for enforcement by the Regional Boards. As so construed, the provision may be read as implicitly containing the qualification "for purpose of reporting and administrative enforcement" after the introductory phrase "[d]ischargers shall be deemed out of compliance with an effluent limitation."

This narrow interpretation is favored, first, by the context of the provision in the Toxics Standards Implementation Policy. The State Board adopted the Toxics Standards Implementation Policy pursuant to its statutory role of overseeing the activities of the Regional Boards. For example, the Regional Boards must secure the approval of the State Board for adoption of basin plans or guidelines (Wat. Code, §§ 13245 & 13245.5), and the State Board may not adopt state policy for water quality control unless it gives the Regional Boards notice and an opportunity to submit recommendations. (Wat. Code, § 13147.) The stated purpose of the Toxics Standards Implementation Policy was "to establish a standardized approach for permitting discharges of toxic pollutants . . . that promotes statewide consistency" and therefore the policy "supercedes basin plan provisions."[16] In light of the supervisory relationship of the State Board to the Regional Boards, it is reasonable to suppose that the State Board intended the provision to apply to compliance determinations by the Regional Boards.

It is also significant that section 2.4.5, paragraph 1, is found in a part of the Toxics Standards Implementation Policy described as containing "reporting requirements including compliance determinations" and under the subheading "Reporting Levels." Though the ML's are to be included in the permit, the requirement appears in the context of reporting requirements: the Regional Board "shall require in the permit that the discharger shall report with each sample result [the ML level]."[17] Again, it is reasonable to read the provision as referring to compliance determinations by the agencies receiving the reports, that is, the Regional Boards.

---

[16]Toxics Standards Implementation Policy, pages 1 and 2.
[17]Toxics Standards Implementation Policy, page 23.

Second, the principle that "courts should construe statutes where possible in favor of validity" also supports a narrow interpretation of paragraph 1, section 2.4.5 of the Toxics Standards Implementation Policy. (*Turner v. Board of Trustees* (1976) 16 Cal.3d 818, 827 [129 Cal.Rptr. 443, 548 P.2d 1115].) As applied to administrative regulations or other quasi-legislative administrative rules or policies, the principle dictates that "[a] court is to interpret a regulation as it would a statute and is to construe it in light of the enabling statute's intendment." (*Blumenfeld v. San Francisco Bay Conservation etc. Com.* (1974) 43 Cal.App.3d 50, 59 [117 Cal.Rptr. 327].)

The State Board clearly possesses authority under the Porter-Cologne Act to oversee the reporting procedures and administrative enforcement guidelines employed by the Regional Boards. (Wat. Code, § 13245.5.) The authority of the Regional Boards to impose reporting requirements implies authority to regulate the content of the reports. (Wat. Code, §§ 13260, 13267 & 13376.) And their discretionary authority to initiate enforcement actions implies authority to adopt guidelines for the exercise of that discretion. (Wat. Code, §§ 13301, 13305, 13308; see also §§ 13385, subds. (b) & (h), 13386 [upon request of a regional board].)

We find no statutory authority, however, that would give the State Board power to frame effluent requirements to reflect the technological limits for detection in discharge samples. Under Water Code section 13142, state policy for water quality control shall consist of "[w]ater quality principles and guidelines," "[w]ater quality objectives," and other principles "deemed essential . . . for water quality control." (*Id.*, § 13142, subds. (a), (b), (c).) Similarly, under Water Code section 13241, the Regional Boards are directed to establish "water quality objectives [to] ensure the reasonable protection of beneficial uses and the prevention of nuisance," which includes a series of factors relating to "beneficial uses," "[e]nvironmental characteristics," "[w]ater quality conditions," "[e]conomic considerations," housing, and recycling. The reference to economic considerations may perhaps authorize technology-based limitations, such as those in the Clean Water Act, but it is less plausible to construe it to refer to detection limits.

Third, it is elementary that "[a] statute should be interpreted with reference to the whole system of law of which it is a part." (*People v. Comingore* (1977) 20 Cal.3d 142, 147 [141 Cal.Rptr. 542, 570 P.2d 723]; *In re Michael G.* (1988) 44 Cal.3d 283, 296 [243 Cal.Rptr. 224, 747 P.2d 1152].) We think that a narrow interpretation of paragraph 1 of section 2.4.5 of the Toxics Standards Implementation Policy is most consistent with other provisions in the interlocking state and federal regulatory schemes.

The question at issue in the interpretation of section 2.4.5—whether ML's should be included generally in permit-compliance determinations or limited to reporting and administrative enforcement—will affect the legal context for resolving issues in two areas of some practical importance: the procedural requirements for modification of ML provisions in permits[18] and the defense of permit compliance (commonly known as the "permit shield") in citizen suits under the Clean Water Act.[19] Since neither of these matters has been briefed, we offer no opinion as to how they should be resolved. We note, however, that the use of ML's in compliance determinations would raise at least the appearance of a novel concept previously unknown in the federal and state regulatory scheme—a compliance-based effluent limitation. In contrast, if the use of ML's is confined to reporting and a guideline for administrative enforcement, the issue may be resolved in terms of existing categories of regulatory law.

## D.  *Disposition*

Our interpretation of section 2.4.5 of the Toxics Standards Implementation Policy as requiring the use of ML's only for purposes of reporting and administrative enforcement precludes the necessity of a writ of mandate or injunctive relief. As so interpreted, we see no basis for invalidating the provision as lying beyond the scope of enabling legislation or enjoining its enforcement and therefore affirm the judgment denying the petition for writ of mandate and complaint for injunctive relief. The complaint for declaratory relief, however, presents a separate issue. The objective of the complaint for declaratory relief was to avoid in anticipated future proceedings an application of section 2.4.5, paragraph 1 that would result in administrative rigidity and an expanded defense of permit compliance. Our decision narrowly interpreting the provision partially satisfies the appellants' objectives. Nevertheless, we consider that it would be an idle act to remand the case for a declaration conforming to this opinion since this decision offers appellants the substantive equivalent of a declaratory judgment. (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 832, pp. 290-292.)

The judgment is affirmed. Both parties are to bear their own costs on appeal.

Stein, Acting P. J., and Margulies, J., concurred.

---

[18]Compare 40 Code of Federal Regulations parts 122.62 and 122.63 (2002).

[19]See 33 United States Code section 1342(k), and section 1365; Clean Water Act Handbook, *supra,* page 81.