[No. C045353. Third Dist. Dec. 29, 2004.]

LLOYD ARNOLD, Plaintiff and Appellant, v.
THE CALIFORNIA EXPOSITION AND STATE FAIR et al., Defendants
and Respondents;
CAPITOL RACING, LLC, Real Party In Interest and Respondent.

COUNSEL

Weintraub Genshlea Chediak Sproul, Dale C. Campbell and Cheryl L. King for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General and Jeremiah D. Blair, Deputy Attorney General, for Defendant and Respondent The California Exposition and State Fair.

Bill Lockyer, Attorney General, Louis R. Mauro, Assistant Attorney General, Kenneth R. Williams and Jonathan K. Renner, Deputy Attorneys General, for Defendant and Respondent Department of General Services.

Salinger Van Dyke and Glen A. Van Dyke for Real Party in Interest and Respondent.

OPINION

**DAVIS, J.**—In this appeal, Lloyd Arnold, a former harness operator at the California Exposition and State Fair (Cal Expo) seeks another spin around the track. He appeals from the denial of his petition for writ of mandate and from the denial of his motions for reconsideration and for attorney fees.[1] In his petition, Arnold sought to have Cal Expo and the Department of General Services (DGS) vacate two one-year operator extensions Cal Expo had granted Capitol Racing, LLC (Capitol), and solicit competitive bids for the

---

[1] An order denying a motion for reconsideration is not appealable, and we will dismiss that part of the appeal. (*Reese v. Wal-Mart Stores, Inc.* (1999) 73 Cal.App.4th 1225, 1229–1230 [87 Cal.Rptr.2d 346].)

operation. After Arnold filed his petition, Cal Expo concluded it had mistakenly provided the extensions, and vacated them. Thereafter, Cal Expo and Capitol entered into a new two-year operating agreement.

On appeal, Arnold contends (1) a harness racing contract is a public services contract subject to competitive bidding; (2) Cal Expo and DGS violated legal duties by failing to evaluate the economic terms of the former contract with Capitol; and (3) he is entitled to attorney fees under the private attorney general theory of Code of Civil Procedure section 1021.5. We disagree and affirm the judgment denying his petition. We conclude that a harness racing contract—in the form presented here—is not a public services contract subject to competitive bidding. We also define Cal Expo's and DGS's legal duties to evaluate the economic terms of a harness racing contract and affirm the trial court's order denying Arnold's request for attorney fees.

### BACKGROUND

First, we must address a question of mootness. Capitol claims that the harness racing contract Arnold has challenged has been replaced with a new and different contract, rendering Arnold's appeal moot. We disagree for the most part.

■ The following issues are not moot in this mandate proceeding: whether a harness racing contract is a public services contract subject to competitive bidding; whether Cal Expo and DGS have a legal duty to evaluate the economic terms of such contracts; and whether Arnold is entitled to attorney fees under Code of Civil Procedure section 1021.5. (*Haywood v. Superior Court* (2000) 77 Cal.App.4th 949, 953 [92 Cal.Rptr.2d 182], quoting *Green v. Superior Court* (1974) 10 Cal.3d 616, 622, fn. 6 [111 Cal.Rptr. 704, 517 P.2d 1168] [a "petition for writ relief is not mooted by subsequent events when these events leave a material question affecting the parties unresolved, or the petition presents [a] ' "matter of continuing public interest and the issue is likely to recur" ' "].)

■ By contrast, the following issue is moot: whether Cal Expo and DGS *properly evaluated* the economic terms of the former harness racing contract between Cal Expo and Capitol, pursuant to a legal duty of evaluation. This issue is moot because no effective mandate relief has been requested or is now available to correct an improper economic evaluation of the former contract, a largely discretionary rather than ministerial act in any event. (See *Taylor v. Board of Trustees* (1984) 36 Cal.3d 500, 507 [204 Cal.Rptr. 711, 683 P.2d 710] [generally, there are two requirements for a writ of mandate to issue: "a clear, present and usually ministerial duty on the part of the

defendant and a clear, present and beneficial right in plaintiff to performance of that duty"].) As we shall also explain, even if Arnold could show an improper economic evaluation, that would not help him on the issue of attorney fees under Code of Civil Procedure section 1021.5.

■ Cal Expo is a "separate independent entity in state government" that is governed by a board of directors. (Food & Agr. Code, § 3311.) It was created to "vitalize" the California Exposition and State Fair and to work toward fiscal independence from the state general fund. (Food & Agr. Code, § 3301.)

Harness racing has been conducted at Cal Expo for many years. Due to the economic instability of the harness racing industry from 1992 through 1997, there was little or no known competition to operate harness racing at Cal Expo. The contracting process did not involve competitive bidding. Cal Expo negotiated directly with independent race operators and entered into lease-type revenue-generating agreements with them; the operators would run the harness races while leasing the race facilities from Cal Expo.

In late 1997, Cal Expo issued a request for proposal (RFP; a bid solicitation) to secure a harness race operator beginning in late 1998. All interested parties, including Arnold and a colleague, Christo Bardis, were invited to participate. Only Capitol submitted a bid proposal. As a result, Capitol and Cal Expo entered into a "Lease Agreement" (Contract No. 1968). The term of the lease was from September 1998 through the end of 2000; additionally, there were two one-year options, which could extend the term through the end of 2002.

In 2000, the harness racing industry was becoming a much better bet economically because of increasing revenue, due in part to legislative changes that spawned more wagering. As a result, there was increased interest in the Cal Expo harness racing contract and the two one-year options between Capitol and Cal Expo.

On October 10, 2000, after hearing from other interested harness race operators, Cal Expo agreed to exercise the two one-year options under Contract No. 1968 with Capitol, and extended the term of the lease through July 26, 2003 (the term went beyond the original end of 2002 to encompass additional race days).

To incorporate the exercise of these options and other changes to Contract No. 1968, Cal Expo's Director of Racing Events, David Elliott, redrafted the contract. In doing so Elliott mistakenly included two additional one-year options, and other Cal Expo personnel assigned a new number to the contract (Contract No. 1986). Elliott was unaware of this mistake and so too was Cal Expo's board.

On March 22, 2002, Cal Expo agreed to exercise the mistaken two one-year options, and extended Contract No. 1986 to July 31, 2005, by drafting an "Amendment No. 1" to the contract. Arnold had objected to this extension on economic grounds, arguing that the contract should be bid competitively and that he would pay Cal Expo nearly $500,000 more over the two-year period. On several occasions over a significant period, Arnold informed Cal Expo, and DGS, that he was interested in undertaking the harness racing contract, noting that Cal Expo was not obtaining the revenue it could under the Capitol contract.

In September of 2002, Arnold filed his petition for writ of mandate. He asked the trial court to vacate the two one-year extensions of Contract No. 1986, and to require competitive bidding once the current harness racing contract expired in July 2003.

In December 2002, after hearing from Arnold and Capitol, Cal Expo rescinded the action it had taken on March 22, 2002—i.e., it vacated the extension of the term for Contract No. 1986 and invalidated Amendment No. 1. Cal Expo also aligned Contract No. 1986 with the action it had taken on October 10, 2000—i.e., it set the term of the contract as December 20, 2000, through July 26, 2003.

These actions prompted Capitol to sue Cal Expo in January 2003 for breach of contract. In July 2003, these two parties settled that lawsuit pursuant to a new two-year contract awarding Cal Expo additional revenue of $800,000 annually. The trial court and this court have judicially noticed this settlement agreement and new contract.

DISCUSSION

1. *Public Services Contract and Competitive Bidding*

Arnold contends that a Cal Expo harness racing contract is governed by the competitive bidding requirements of the Public Contract Code because it is a public *services* contract under Public Contract Code section 10335. (See also Pub. Contract Code, §§ 10339, 10340 [related sections governing competitive bidding].) We disagree.

Because this contention requires us to determine whether a statutory standard applies to a particular type of contract, it presents a question of law that we determine independently. (*Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 212 [100 Cal.Rptr.2d 718] (*Harustak*); *McMillin-BCED/Miramar Ranch North v. County of San Diego* (1995) 31 Cal.App.4th 545, 553 [37 Cal.Rptr.2d 472] (*McMillin*).)

Public Contract Code section 10335 states, as pertinent, that "[t]his article [article 4, Contracts for Services] shall apply to all contracts, including amendments, entered into by any state agency *for services to be rendered to the state*, whether or not the services involve the furnishing or use of equipment, materials, or supplies or are performed by an independent contractor." (Pub. Contract Code, § 10335, subd. (a), italics added.) In a nutshell, Arnold argues that a harness racing operator renders harness racing management services to the state pursuant to contract. Concluding that the harness racing contract is a service contract, Arnold maintains that competitive bidding is required. (See Pub. Contract Code, §§ 10339, 10340.)

■ The Public Contract Code does not define a "services contract." The structure of the harness racing contract at issue here certainly does not fit the typical profile of a contract for goods or services entered into between the state and a third party. In that context, California buys goods or services from a third party, or contracts for the third party to provide goods or services that California is obligated to provide, and California then pays the third party for those goods or services. The harness racing contract here has Capitol using Cal Expo's harness racing facilities *and paying Cal Expo* for that use, rather than the other way around.

The harness racing contract presented here is more in the nature of a lease agreement, and indeed is denominated as such; the contract includes typical lease provisions describing the premises, the rent to be paid, and the term. (See *Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 30 [31 Cal.Rptr.2d 378] (*Golden West*).) The harness racing contract involves a commercial business operator using certain state facilities to generate revenue. This characterization of the contract finds support in statutory, decisional and administrative law.

■ As for statutory law, Cal Expo has the statutory power to "[l]ease, with the approval of [DGS], any of its property for any purpose for any period of time[,]" and to "[u]se or manage any of its property, with the approval of [DGS], jointly or in connection with any lessee or sublessee, for any purpose approved by the board." (Food & Agr. Code, § 3332, subds. (m), (n), respectively.) According to an opinion from the Attorney General, these statutory provisions were designed so Cal Expo could accomplish "private development leases." (68 Ops.Cal.Atty.Gen. 23, 25, fn. 3 (1985).) Under such leases, revenue-generating facilities at Cal Expo such as a hotel complex, convention center, or major rides and amusements, would be financed and constructed by private developers in return for long-term operating leases. (*Id.* at pp. 25–26, fn. 3.) These lease agreements share similarities with a harness racing contract in that private commercial enterprises use Cal Expo facilities to generate revenue.

■ As for decisional law, an observation in *Golden West* is instructive. In discussing how a particular agreement was to be legally characterized, the *Golden West* court observed that "[a]rrangements between landowners and those who conduct commercial operations upon their land are so varied that it is increasingly difficult and correspondingly irrelevant to attempt to pigeon-hole these relationships as 'leases,' 'easements,' 'licenses,' 'profits,' or some other obscure interest in land devised by the common law in far simpler times." (*Golden West, supra,* 25 Cal.App.4th at p. 36.) The point of this observation, as it relates to a harness racing contract in the form presented here, is that however arrangements between landowners and those who conduct revenue-generating commercial operations upon their land are to be characterized, "pigeonholing" such an arrangement as a "services contract," and therefore subject to competitive bidding, does not fly.

■ Finally, as for administrative law, DGS reviewed the legal sufficiency of the March 22, 2002, harness racing contract between Cal Expo and Capitol, and approved it; this contract was not put out for bid. (See Food & Agr. Code, § 3332, subds. (m), (n) [DGS required to approve lease and property use contracts of Cal Expo].) Such review and approval would encompass the question of whether that contract legally required competitive bidding (particularly since Arnold argued at the March 22 proceeding that the contract should be put out for bid). DGS obviously did not think so. ■ DGS's conclusion is entitled to judicial deference, coming from an administrative agency with expertise in the state government contracting process. (See Gov. Code, §§ 14600, 14670 [DGS generally manages California's business and property functions]; *Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1104 [1 Cal.Rptr.3d 76] (*Communities for a Better Environment*) [while interpretation of a statute is ultimately a question of law, a court must defer to an administrative agency's interpretation of a statute involving its area of expertise, unless the interpretation flies in the face of the clear language and purpose of the interpreted provision].)

We conclude that a Cal Expo harness racing contract—in the form presented here—is not a public services contract subject to competitive bidding.

2. *Duty to Evaluate Economic Terms of Harness Racing Contracts*

Arnold contends that Cal Expo and DGS each have a legal duty to evaluate the economic terms of a harness racing contract. We agree.[2]

---

[2] Arnold also claims that Cal Expo and DGS *improperly evaluated* the economic terms of the former harness racing contract between Cal Expo and Capitol pursuant to these legal duties. Previously, we concluded that this claim is moot in light of the new contract between Cal Expo and Capitol and the nature of a mandate proceeding.

■ Since Arnold's contention requires us to examine whether these two entities have such a duty, it presents a question of law that we determine independently. (*Harustak, supra,* 84 Cal.App.4th at p. 212; *McMillin, supra,* 31 Cal.App.4th at p. 553.)

■ Cal Expo does indeed have a legal duty to evaluate the economic terms of a harness racing contract. As pertinent here, Cal Expo, by statute, has the power to contract, to lease (with DGS's approval) any of its property for any purpose for any period of time, and to use or manage any of its property (again with DGS's approval) jointly or in connection with any lessee or sublessee for any purpose approved by the Cal Expo board. (Food & Agr. Code, § 3332, subds. (a), (m) & (n), respectively.) These broad powers, however, must be exercised within the terms of the very statute that created Cal Expo, Food and Agricultural Code section 3301. Section 3301 states that Cal Expo's board "*shall develop a policy* which provides *managerial and fiscal responsibility* and *shall work towards a goal of fiscal independence* from state General Fund support." (Italics added; see also 68 Ops.Cal.Atty.Gen., *supra,* at pp. 26–27 [while exercising its broad leasing powers under section 3332, Cal Expo must still exercise sound discretion to ensure, in line with Food and Agricultural Code section 3301, that its best interests are advanced and its statutory purposes fulfilled].)

■ The question of whether DGS has a legal duty to evaluate the economic terms of a Cal Expo harness racing contract requires more analysis. As noted, by statute Cal Expo must have DGS's approval to lease any of its property or to use or manage any of its property with any lessee or sublessee. (Food & Agr. Code, § 3332, subds. (m), (n).)

In its brief on appeal, DGS notes that, absent a statutory exception, it handles the leasing of all state property on behalf of all state agencies. (Gov. Code, § 14670 et seq.) DGS also notes that Cal Expo is the beneficiary of one such exception, Food and Agricultural Code section 3332, subdivision (m) (the lease provision). According to DGS, consistent with the Legislature's creation of Cal Expo as a "new entity in state government . . . with sufficient autonomy" (Food & Agr. Code, § 3301), the Legislature gave Cal Expo the "unique" authority to negotiate and prepare its own contracts and leases. (Food & Agr. Code, § 3332, subds. (a), (m) & (n); see also 68 Ops.Cal.Atty.Gen., *supra,* at p. 25 [Legislature granted leasing authority to Cal Expo "in terms *which could not have been broader*"].) Accordingly, says DGS, it does not, and cannot, negotiate leases or contracts on Cal Expo's behalf. An administrative agency's interpretation of a statute involving its area of expertise is entitled to judicial deference. (*Communities for a Better Environment, supra,* 109 Cal.App.4th at p. 1104.)

 Nevertheless, the "sufficient autonomy" granted Cal Expo under Food and Agricultural Code section 3301 is to be "balanced," according to that same statute, "by appropriate state oversight." Hence, the two statutes allowing Cal Expo to lease its property and to use its property with lessees limit this authority by requiring DGS approval. (Food & Agr. Code, § 3332, subds. (m), (n).) The legislative history concerning these two statutes, as quoted in the Attorney General's opinion, states that " '[r]eview by Department of General Services provides safeguards to insure that such leases are in the best interests of the State.' " (68 Ops.Cal.Atty.Gen., *supra*, at p. 26, fn. 4, italics omitted.) DGS is familiar with this "best interests" standard because DGS's leasing authority over state property is to be conducted "in the best interest of the state." (Gov. Code, § 14670, subds. (a), (b).) Finally, pursuant to statute, DGS "has general powers of supervision over all matters concerning the financial and business policies of the state in regard to the duties, powers, responsibilities, and jurisdiction specifically vested in the [DGS]." (Gov. Code, § 14615, subd. (a).)

In approving the harness racing contract at issue here, DGS reviewed the contract and prepared a written "Lease Summary" regarding its key terms, including its economic terms. In a letter to one of Arnold's former colleagues, DGS stated that its current "policy" is "to review leases presented by [Cal Expo] for legal[]sufficiency of the lease. If the lease meets those requirements, the DGS will approve the transaction." DGS does not involve itself in Cal Expo's business decisions.

 Applying these facts and law, we conclude as follows regarding DGS's legal duty to evaluate the economic terms of a Cal Expo harness racing contract. Balancing Cal Expo's autonomy with DGS's required oversight, DGS, in approving such a contract, is to review the contract and prepare a written summary of its key terms, including its economic terms; as noted, this is what DGS did here. If it is readily apparent from this brief economic summation, based on DGS's experience and expertise in state property leasing, that the harness racing contract or a feature of it is not in the state's best interest, DGS cannot approve the contract.

3. *Code of Civil Procedure Section 1021.5—Private Attorney General Attorney Fees*

Arnold contends the trial court erroneously denied his motion for attorney fees under Code of Civil Procedure section 1021.5 (section 1021.5). We disagree.

 Section 1021.5 codifies the "private attorney general" doctrine under which attorney fees may be awarded to successful private litigants who

further the public interest. To obtain fees under section 1021.5 requires a showing that the litigation: (1) served to vindicate an important public right; (2) conferred a significant benefit on the general public or a large class of persons; and (3) was necessary and imposed a financial burden on the fee requester which was out of proportion to his or her individual stake in the matter. (§ 1021.5; *Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors* (2000) 79 Cal.App.4th 505, 511 [94 Cal.Rptr.2d 205] (*Families Unafraid*).)

 The trial court's determination regarding these three criteria lies within its discretion. (*Families Unafraid, supra,* 79 Cal.App.4th at p. 511.) "In reviewing the trial court's decision, we must pay ' "particular attention to the trial court's stated reasons in denying or awarding fees and [see] whether it applied the proper standards of law in reaching its decision." ' " (*Id.* at p. 512, quoting *Hewlett v. Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 544 [63 Cal.Rptr.2d 118]; see *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1298 [255 Cal.Rptr. 704].) A trial court may deny a section 1021.5 fee request if one of these three criteria is not met. (*Satrap v. Pacific Gas & Electric Co.* (1996) 42 Cal.App.4th 72, 80–81 [49 Cal.Rptr.2d 348].)

In requesting section 1021.5 fees, Arnold argued that he filed his petition for writ of mandate because Cal Expo's harness racing contract with Capitol (Contract No. 1986) violated governing statutes. Arnold maintained that Cal Expo failed to properly approve the two one-year extensions of Contract No. 1986 and failed to undertake competitive bidding to ensure fair market revenue, and that Cal Expo and DGS failed to evaluate and analyze the economic terms of the contract.

Arnold claimed that in direct response to his petition, Cal Expo vacated the two one-year extensions of Contract No. 1986 and renegotiated a new harness racing contract with Capitol in which Capitol agreed to pay an additional $800,000 per year, for two years. Arnold argued that his litigation clearly enforced Cal Expo's and DGS's statutory obligations of fiscal and managerial responsibility when contracting on behalf of the public, resulting in $1.6 million dollars of additional public revenue.

The trial court denied Arnold's section 1021.5 request, determining that Arnold's "own financial interest in this matter was such that an award of attorneys' fees is not appropriate. The relief obtained at the December[] 2002[] Cal Expo board meeting, which vacated those [two one-year] contract extensions [to Contract No. 1986], gave [Arnold] the opportunity to compete for a potentially lucrative future public contract with Cal Expo. (See *United Systems of Arkansas, Inc. v*[.] *Peter Stamison* (1998) 63 C[al.]A[pp.] 4th 1001 [*United Systems*].)"

Thus, the trial court found that Arnold did not meet the financial burden criterion for awarding attorney fees under section 1021.5. The trial court did not abuse its discretion in so finding.

■ "The basic legal standard for applying the financial burden criterion involves a realistic and practical comparison of the litigant's personal interest with the cost of suit. [Citations.] The issue, in short, is whether the cost of litigation is out of proportion to the litigant's stake in the litigation." (*Families Unafraid, supra,* 79 Cal.App.4th at p. 515.)

Arnold had run the harness racing operation in the early 1990's at Cal Expo and wanted to do so again. His appetite for returning to the Cal Expo track had been whetted by the enactment in 1999 and 2001 of two legislative measures which, he claimed, increased significantly the "handle" available (i.e., the amount of wagering) for Cal Expo harness racing: satellite broadcasting of the races, and advanced deposit (online) wagering. It is no stretch to say the record shows Arnold was chomping at the bit to again run the Cal Expo harness racing operation. On several occasions over a significant period, he informed Cal Expo that he would provide it with hundreds of thousands of additional revenue dollars if he were awarded the harness racing contract. Arnold was quite specific about these amounts and his intent.

Contrary to Arnold's view, the record discloses that his financial interest in the harness racing contract was specific, concrete and significant, and based on objective evidence. (See *Families Unafraid, supra,* 79 Cal.App.4th at p. 516; see also *Punsly v. Ho* (2003) 105 Cal.App.4th 102, 116 [129 Cal.Rptr.2d 89]; *Williams v. San Francisco Bd. of Permit Appeals* (1999) 74 Cal.App.4th 961, 970–971 [88 Cal.Rptr.2d 565].) The record also discloses that Arnold had incurred about $57,000 in attorney fees up to the point that Cal Expo vacated the two one-year contract extensions in December 2002.

Arnold takes issue with the trial court's reasoning that Cal Expo's rescission in December 2002 of the two one-year extensions of Contract No. 1986 gave Arnold an opportunity to compete for the potentially lucrative Cal Expo harness racing contract. Arnold argues that Cal Expo still did not put the contract out to bid at that point. But as attested to by the award of the Contract No. 1986 extension to Capitol and by Arnold's own actions in seeking that contract extension, submitting a bid was not required to obtain the contract.

■ The trial court's citation to our decision in *United Systems* is particularly apt. In *United Systems,* a losing bidder for a state contract successfully challenged a bid protest procedure on administrative and statutory grounds. (*United Systems, supra,* 63 Cal.App.4th at p. 1004.) We rejected

the bidder's request for attorney fees under section 1021.5. (*Id.* at p. 1013.) We reasoned that such a request "is not appropriate where the [the requester] brought suit to protect its property rights and not to further a significant public interest [citation], or the public benefit gained is coincidental to [the requester's] strong personal economic interests [citation]. . . . [The bidder here] brought suit challenging the [bid] protest procedures . . . in order to have a chance at obtaining a contract worth almost half a million dollars." (*Ibid.*) Similar reasoning applies here.

## DISPOSITION

The judgment and the order denying Arnold's request for attorney fees under Code of Civil Procedure section 1021.5 are affirmed. The appeal from the order denying reconsideration is dismissed.

Blease, Acting P. J., and Butz, J., concurred.