[No. A107572. First Dist., Div. One. Aug. 29, 2005.]

COMMUNITIES FOR A BETTER ENVIRONMENT et al., Plaintiffs and Appellants, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants and Respondents;
TESORO REFINING AND MARKETING COMPANY, Real Party in Interest and Respondent.

1316

## COUNSEL

Earthjustice, Shana Lazerow, Deborah A. Sivas and Michael R. Lozeau for Plaintiffs and Appellants Communities For A Better Environment and San Francisco Baykeeper.

Adrienne Bloch and William B. Rostov for Plaintiff and Appellant Communities For A Better Environment.

Waterkeepers Northern California, Leo P. O'Brien and Sejal Choksi for Plaintiff and Appellant San Francisco Baykeeper.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Clifford T. Lee and Gavin G. McCabe, Deputy Attorneys General, for Defendants and Respondents.

Bingham McCutchen, Rick R. Rothman, John R. Reese and Marc R. Bruner for Real Party in Interest and Respondent.

Pillsbury Winthrop, Margaret Rosegay and Norman F. Carlin for Western States Petroleum Association as Amicus Curiae on behalf of Real Party in Interest and Respondent.

Downey Brand, Melissa A. Thorme and Nicole E. Granquist for Bay Area Clean Water Agencies as Amicus Curiae on behalf of Real Party in Interest and Respondent.

## OPINION

MARCHIANO, P. J.—Real party in interest Tesoro Refining and Marketing Company (Tesoro) operates the Golden Eagle Refinery (the Refinery) near Avon, California, on the shores of Suisun Bay. The Refinery operates under a National Pollutant Discharge Elimination System (NPDES) permit issued by the Regional Water Quality Control Board, San Francisco Bay Region (Regional Board). The permit regulates the Refinery's discharges of dioxins and other pollutants into Suisun Bay. In June 2000 the Regional Board amended the permit. After an administrative appeal, the State Water Resources Control Board (State Board) upheld the amended permit.

Appellants, Communities for a Better Environment and San Francisco BayKeeper, challenged the amended 2000 permit by a petition for writ of mandate in the superior court. Appellants raised three issues: (1) that the amended 2000 permit failed to comply with applicable federal pollution control laws because it failed to set a numeric "water quality based effluent limit" (WQBEL) for dioxin discharges; (2) that the permit violated the antibacksliding provisions of the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), commonly known as the Clean Water Act (CWA); and (3) that the permit's schedule of compliance was invalid.

The superior court agreed with appellants regarding issue (1) and granted the petition without reaching issues (2) and (3). Tesoro appealed. We reversed, "because a WQBEL does not have to be numeric in all cases, and under the circumstances of this case three administrative agencies properly

approved the amended permit as a valid means of pollution control." (*Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1091 [1 Cal.Rptr.3d 76] (*CBE I*).)

We remanded for the trial court to consider issues (2) and (3). (*CBE I, supra,* 109 Cal.App.4th at p. 1108.) We now revisit this case because the trial court resolved those issues against appellants. We affirm for the following reasons.

## I. BACKGROUND

Before we review the merits, we must first discuss the legal, factual, and procedural background of this case. We do so by quoting rather extensively from *CBE I.*

### A. Legal Background

"We begin with a brief overview of the applicable law. To enhance understanding we use [bold] italics to introduce significant terms of art of pollution control.

■ "In 1972, Congress enacted the [CWA]. (See *WaterKeepers Northern California v. State Water Resources Control Bd.* (2002) 102 Cal.App.4th 1448, 1452 [126 Cal.Rptr.2d 389] (*WaterKeepers*).) The goal of the CWA is 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.' (33 U.S.C. § 1251(a); see *Arkansas v. Oklahoma* (1992) 503 U.S. 91, 101 [117 L.Ed.2d 239, 112 S.Ct. 1046] (*Arkansas*).)

"Generally, the CWA 'prohibits the discharge of any pollutant except in compliance with one of several statutory exceptions. [Citation.]' (*WaterKeepers, supra,* 102 Cal.App.4th at p. 1452.) The most important of those exceptions is pollution discharge under a valid NPDES permit, which can be issued either by the Environmental Protection Agency (EPA), or by an EPA-approved state permit program such as California's. (33 U.S.C. § 1342; *WaterKeepers, supra,* at p. 1452; see *Arkansas, supra,* 503 U.S. at pp. 101–103.) NPDES permits are valid for five years. (33 U.S.C. § 1342(b)(1)(B).)

■ "Under the CWA's NPDES permit system, the states are required to develop *water quality standards*. (33 U.S.C. § 1313(a); see *Arkansas, supra,* 503 U.S. at p. 101.) A water quality standard 'establish[es] the desired condition of a waterway.' (503 U.S. at p. 101.) A water quality standard for any given waterway, or 'water body,' has two components: (1) the designated

beneficial uses of the water body and (2) the ***water quality criteria*** sufficient to protect those uses. (33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131.3(i) (2002).)

"Water quality criteria can be either ***narrative*** or ***numeric***. (40 C.F.R. § 131.3(b) (2002).) By way of example, in its decision below the State Board noted that '[a] typical narrative criterion . . . prohibits "the discharge of toxic pollutants in toxic amounts." ' A numeric criterion establishes a quantitative limitation on pollutant concentrations or levels, to protect beneficial uses of the water body. (40 C.F.R. § 131.3(b) (2002).) The State Board noted, 'An example of a numeric saltwater criterion for copper to protect aquatic life is 3.1 micrograms per liter (µg/l) as a monthly average.' " (*CBE I, supra,* 109 Cal.App.4th at pp. 1092–1093, boldface added.)

■ "Generally, to meet water quality standards a polluter must comply with ***effluent limitations***. The CWA defines an effluent limitation as 'any restriction established by a State or the [EPA] Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance.' (33 U.S.C. § 1362(11).)[1] 'Effluent limitations are a means of *achieving* water quality standards.' (*Trustees For Alaska v. E.P.A.* (9th Cir. 1984) 749 F.2d 549, 557, italics in original, boldface added.)

■ "NPDES permits establish effluent limitations for the polluter. (33 U.S.C. §§ 1311, 1312, 1342(a)(1); *EPA v. State Water Resources Control Board* (1976) 426 U.S. 200, 205 [48 L.Ed.2d 578, 96 S.Ct. 2022] (*EPA*).) CWA's NPDES permit system provides for a two-step process for the establishing of effluent limitations. First, the polluter must comply with ***technology-based effluent limitations***, which are limitations based on the best available or practical technology for the reduction of water pollution. (33 U.S.C. § 1311(b)(1)(A); see *EPA, supra,* at pp. 204–205.)

"Second, the polluter must also comply with more stringent ***water quality-based* effluent limitations (*WQBEL's*)** where applicable. In the CWA, Congress 'supplemented the "technology-based" effluent limitations with "water quality-based" limitations "so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels." ' (*National Wildlife Fed. v. U.S. Army Corps* (D.Or. 2000) 92 F.Supp.2d 1072, 1075, quoting *EPA, supra,* [426] U.S. at p. 205, fn. 12.)

---

[1] A "point source" is defined, as pertinent to this case, as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." (33 U.S.C. § 1362(14).)

■ "The CWA makes WQBEL's applicable to a given polluter whenever WQBEL's are 'necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations . . . .' (33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. § 122.44(d)(1) (2002).) Generally, NPDES permits must conform to state water quality laws insofar as the state laws impose more stringent pollution controls than the CWA. (33 U.S.C. § 1370; see Wat. Code, §§ 13263, subd. (a), 13372.) Simply put, WQBEL's implement water quality standards. [Fn. omitted.]" (*CBE I, supra,* 109 Cal.App.4th at pp. 1093–1094, boldface added.)[2]

■ "In California, water quality standards are established through regional water quality control plans, known as basin plans, which are approved by the State Board. (See *WaterKeepers, supra,* 102 Cal.App.4th at pp. 1451–1452.)" (*CBE I, supra,* 109 Cal.App.4th at p. 1094, fn. 2.) The basin plan pertinent to this case, the San Francisco Bay Basin Plan, was approved by the State Board in 1995.

"Water quality standards do more than provide the basis for deriving effluent limits. The standards also are instrumental in identifying bodies of water which are impaired by the cumulative discharges of pollutants. The CWA requires the states to identify all bodies of water for which technologically-based effluent limitations are insufficient to maintain water quality standards. (33 U.S.C. § 1313 (d)(1)(A); see 40 C.F.R. § 130.7 (2002).)

"For all such identified water bodies, and for all appropriate pollutants discharged therein, the state must establish a **total maximum daily load** (*TMDL*), which defines the maximum amount of the pollutant which can be discharged—or 'loaded'—into the body of water from all combined pollution sources. (40 C.F.R. § 130.2(i) (2002); see *Dioxin/Organochlorine Center v. Clarke* (9th Cir. 1995) 57 F.3d 1517, 1520.) A TMDL is 'a written, quantitative plan and analysis for attaining and maintaining water quality standards in all seasons for a specific waterbody and pollutant.' (40 C.F.R. § 130.2(h) (2002).)

■ "A TMDL must be 'established at a level necessary to implement the applicable water quality standards . . . .' (33 U.S.C. § 1313(d)(1)(C).) A TMDL assigns a **waste load allocation** (*WLA*) to each point source, which is that portion of the TMDL's total pollutant load, which is allocated to a point source for which a NPDES permit is required. (40 C.F.R. § 130.2(g) (2002).)

---

[2] For a discussion of the interplay between state and federal water quality law, see *City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 629 [26 Cal.Rptr.3d 304, 108 P.3d 862] (conc. opn. of Brown, J.).

Once a TMDL is developed, effluent limitations in NPDES permits must be consistent with the WLA's in the TMDL. (§ 122.44(d)(1)(vii)(B).) In fact, a WLA in a completed TMDL is a type of WQBEL. (40 C.F.R. § 130.2(h) (2002).)" (*CBE I, supra,* 109 Cal.App.4th at pp. 1095–1096, boldface added.)

## B. Factual Background

"The factual background of this case, both scientific and historical, is not in material dispute." (*CBE I, supra,* 109 Cal.App.4th at p. 1096.)[3]

## 1. Scientific Background—Dioxins and Furans[4]

"Dioxins (polychlorinated dibenzodioxins) and furans (polychlorinated dibenzofurans) are two classes of over 200 structurally similar compounds. Seventeen of these compounds are considered the most toxic, at least for the purposes of the water quality case now before us. The most toxic of the 17 is the dioxin known as '2,3,7,8-tetrachlorodibenzo-p-dioxin,' also known as '2,3,7,8-TCDD.' The other 16 compounds are 6 dioxins and 10 furans, collectively considered 'congeners' of 2,3,7,8-TCDD, meaning simply that they possess similar qualities or characteristics [fn. omitted]. For the sake of simplicity, further references to 'dioxins' in this opinion are to these 17 toxic dioxins and furans.

"Dioxins are not produced intentionally. They are formed as undesired byproducts of combustion and the manufacture and use of certain chlorinated chemical compounds. They exist in the environment worldwide, particularly in air, water, soils, and sediments. They enter the atmosphere through aerial emissions and widely disperse through a number of processes, including erosion, runoff, and volatilization from land or water. For example, automobile exhaust is a common source of dioxins.

"Dioxins are insoluble in water and very persistent in soil and sediments. They are absorbed into organic matter and bioaccumulate in human and animal tissue. They enter the food chain and thus bioaccumulate in human tissue from consumption of contaminated food, especially meat, fish, shellfish, and eggs.

---

[3] In the present proceeding, appellants attempt to present purported facts in their opening brief which are not the controlling, material facts of this case.

[4] In *CBE* I, we took the facts in this subsection primarily from the written decision of the State Board. As we said then: "We by no means intend to present a comprehensive scientific discussion of the nature of dioxins and furans and their effect on the environment. Such a discussion is neither within the expertise of this court nor necessary for our resolution of this case." (*CBE I, supra,* 109 Cal.App.4th at p. 1096, fn. 4.)

"The EPA has targeted dioxins as dangerous and toxic substances since at least 1984. The State Board and the Regional Board have regulated dioxin discharges since at least the early 1990's." (*CBE I, supra,* 109 Cal.App.4th at pp. 1096–1097.)

## 2. Historical Background

"As noted in the lead paragraph, Tesoro operates the Refinery on the shores of Suisun Bay [fn. omitted]. The Refinery processes an average of 150,000 barrels of crude oil a day, producing gasoline and diesel fuel. Treated wastewater from the Refinery production—an average of 4.7 million gallons per day—is discharged into Suisun Bay through an outfall pipe known as 'Waste 001.' Waste 001 lies at the end of a two-mile canal, known as the 'Clean Canal,' through which storm water from several other industrial facilities drains into the bay. Thus, only a portion of the bay discharge from Waste 001 comes from the Refinery—although that fact was not known at the outset, but only emerged over time.

"Five of the 17 dioxins discussed above are consistently found in the Refinery's wastewater. The five do not include 2,3,7,8-TCDD.

"The Refinery's discharges are governed by NPDES permit No. CA0004961, first issued by the Regional Board in 1988. In 1993, the Regional Board reissued the permit, and imposed—apparently for the first time—a numeric WQBEL for dioxins. The 1993 permit included a WQBEL of 0.14 picograms per liter (pg/L) of 'TCDD equivalents.'[5] The phrase 'TCDD equivalents' refers to the 17 toxic dioxins discussed above. The WQBEL of 0.14 pg/L was based on the State Board's 1992 amendments to the San Francisco Bay Basin Plan.

"The 1993 permit included a compliance schedule consisting of six tasks the Refinery was charged to complete. These included continuing a pilot study of a method of pollution control, and submitting technical and progress reports. The Refinery was to comply fully with the effluent limit by June 30, 1995. It appears that when the 1993 permit was issued, the Regional Board assumed the Refinery was the sole, or at least the primary, source of dioxin discharge into Suisun Bay.

"By October 1993, the Refinery had begun treating its wastewater with granulated activated carbon. This treatment was 'successful at removing greater than 95% of the dioxins' from the Refinery's discharges." (*CBE I, supra,* 109 Cal.App.4th at p. 1097.)

---

[5] "A picogram is one million-millionth of a gram, or $1 \times 10^{-12}$ gram." (*CBE I, supra,* 109 Cal.App.4th at p. 1097, fn. 7.)

"On June 21, 1995, the Regional Board reaffirmed the Refinery's 1993 NPDES permit, by rejecting the Refinery's request for an amendment to the numeric WQBEL for dioxins. The Regional Board found that 'the effluent limit specified' in the 1993 permit 'is appropriate and necessary for the full protection of water quality for beneficial uses.'

"On November 15, 1995, the Regional Board issued a cease-and-desist order (CDO) against the Refinery. In the CDO the Regional Board observed that—despite the removal of 95 percent of the dioxins from the wastewater by carbon treatment—the monitoring data since November 1993 'show no appreciable reduction of [dioxin] levels in the discharge from [the Refinery]. The data show that although treatment of the regeneration wash water was effective at the source, it had little if any impact on the final discharge.'

"The Regional Board then observed: '[The Refinery] has performed some preliminary studies to determine other potential sources of dioxins to Waste 001. Although not conclusive at this time because of the limited amount of data available, these preliminary studies indicate that [the Refinery's] treatment plant effluent may not be the major source of dioxins in the Waste 001 discharge. Other streams which combine with the treatment plant effluent in the "Clean Canal" may be contributing greater quantities of dioxins. These streams include [the Refinery's] coke storage pond water, storm water runoff from non-process areas, storm water runoff from adjoining properties, and possibly even sediment in the "Clean Canal." Further investigation is necessary to verify any of these preliminary findings.'

"The Regional Board found that the Refinery 'has put forth a reasonable amount of effort . . . to solve the dioxin problem by installing the treatment system for catalytic reformer wash water.' But the fact of continued pollution remained, regardless of the uncertainty about its source. The Regional Board found that all seven compliance samples of the Waste 001 discharge into Suisun Bay contained dioxins above the effluent limit of the 1993 permit, i.e., 0.14 pg/L. 'These data show that [the Refinery] has violated and is threatening to continue to violate the effluent limit for dioxin specified in' the 1993 and 1995 permits. Thus, 'additional effort is necessary to reduce the discharge of dioxins so that beneficial uses of the receiving water are fully protected.'

"Accordingly, in the CDO the Regional Board ordered the Refinery to immediately comply with an interim effluent limit of 0.14 pg/L for 2,3,7,8-TCDD, the most toxic dioxin, and to conduct a comprehensive study of measures to enable the Refinery to comply with a final effluent limit of 0.14

pg/L for all 17 dioxins. Such 'final compliance' with the effluent limit for all dioxins was required by July 1, 1999." (*CBE I, supra,* 109 Cal.App.4th at pp. 1098–1099.)

"On June 16, 1999, the Regional Board issued an order extending the deadline for final compliance to July 1, 2000. In its six-page order, the Regional Board found the Refinery 'has been in compliance with the interim' effluent limit for 2,3,7,8-TCDD. The Regional Board further found that the Refinery was still out of compliance with the effluent limits for the other 16 dioxins, as set forth in the 1993 and 1995 permits, but through its pollution control efforts the Refinery had substantially reduced discharge concentrations of those dioxins.

"The Regional Board also noted that a Refinery investigation had shown that the refinery was not the primary source of dioxins in Suisun Bay. Rather, the dioxins entered the water by 'atmospheric deposition,' from sources such as motor vehicle exhaust and wood burning. The Refinery's wastewater thus became a 'conveyance[] of dioxins . . . from other sources.'

"The Regional Board granted the extension of the final compliance deadline because changes in the statewide water quality standards and policies regarding dioxins were forthcoming, and the Regional Board believed that any action to revise the terms of the CDO should await the new standards.

"In May of 1999 the EPA formally declared Suisun Bay an impaired water body for several pollutants, including dioxins. In November 1999 the EPA wrote the Regional Board regarding the Refinery's permit, and stated the WQBEL for dioxins should be zero 'unless a TMDL is completed which concludes that an alternative load can be assimilated by the receiving water.' The EPA proposed that the Refinery's permit contain '[a] final limit . . . that compliance with the final WQBEL will be required within ___ years (not to exceed the time allowed in the Basin Plan). This limit will either be the WLA determined from an approved TMDL, or zero.' The EPA also suggested that the Refinery be subject to numerous provisions, including a ban on increasing the mass of dioxins in the Bay and the implementation of an aggressive source control program.

"The EPA reviewed the Regional Board's proposed changes to the permit. By a letter dated February 1, 2000, the EPA commented favorably on the proposed changes. The EPA specifically agreed with the Regional Board's proposal to complete a TMDL to derive a final WQBEL for dioxins. The EPA also agreed that the proposed permit incorporated EPA's suggested scheme of final limits of either a WLA from a completed TMDL, or zero—and that these proposed final limits" complied with the WQBEL requirements we discussed in *CBE I.* (*CBE I, supra,* 109 Cal.App.4th at pp. 1099–1100.)

"On February 16, 2000, the Regional Board implemented the proposed changes by reissuing the Refinery's NPDES permit. The 2000 permit concluded that the Refinery's dioxin discharges have a reasonable potential of exceeding water quality standards. The 2000 permit retained the 0.14 pg/L WQBEL for all 17 dioxins. The Regional Board noted in the permit that the Refinery continued to reduce substantially dioxin concentration, and that the Refinery was not the primary source of the dioxins.

"The WQBEL of 0.14 pg/L was retained as an interim limitation, imposed pending the completion of a TMDL. In light of the 1999 EPA finding that Suisun Bay was impaired for dioxins, the Regional Board included in the 2000 permit a statement of its intent to adopt a TMDL for dioxins by 2010. The TMDL for dioxins would include a WLA for the Refinery. 'The final effluent limitations for [the Refinery's dioxin] discharge will be based on [the] WLA[] . . . derived from the TMDL[].' The Regional Board determined to maintain the effluent limitations from the 1995 permit until such time as the TMDL was completed—at that point the Regional Board '[would] adopt a WQBEL consistent with the corresponding WLA.'

"The adoption of the TMDL involved the EPA and was expected to take up to 13 years from the May 1999 EPA finding.

"On June 21, 2000, the Regional Board amended the 2000 permit. In what we shall refer to as 'the 2000 amendment,' the Regional Board rescinded the numeric WQBEL of 0.14 pg/L because it was 'not appropriate' for the Refinery. The Board gave two reasons for this action. First, the May 1999 EPA finding required a 'region wide cross media assessment of the [dioxin] problem . . . [which] should result in a more balanced, and more effective limitation' for the Refinery.

"Second, '[the Refinery] has reduced the dioxins . . . in its discharge by 85 percent since CDO adoption. Despite this [the Refinery] cannot comply with [the numeric WQBEL]. The root cause of the violations [is] not within [the Refinery's] control, and the next step of treatment will be overly burdensome and not cost effective relative to the benefits. [The Refinery] provided data in 1997 that supports [its] contention that the violations are caused by ambient air deposition of dioxins . . . . Much of this is beyond [the Refinery's] control . . . . [The Refinery] has estimated that $10 [m]illion may be necessary to implement the next step of reduction. [The Refinery's] mass contribution is minor compared to other storm water inputs into the Bay.' " (*CBE I, supra,* 109 Cal.App.4th at p. 1100.)

"The Regional Board replaced the numeric WQBEL with an interim effluent limitation of 0.65 pg/L. This was not a WQBEL—the new interim effluent limitation was not water quality-based, but performance-based. That is, the new interim effluent limitation was based on facility performance, viz., the actual concentrations of dioxins in the Refinery's discharge. The limitation applied to five of the 17 dioxins actually found in the discharge. But the 2000 amendment requires the Refinery to monitor for all 17 dioxins. The limitation was calculated from effluent samples collected from August 1996 to January 2000. The limitation was based on the mean plus three standard deviations. It represents the 99.87 percentile of the August 1996 to January 2000 data.

"The Regional Board intended the 0.65 pg/L interim effluent limitation to apply until the EPA prepared a TMDL for dioxins in Suisun Bay, at which point the final WQBEL for dioxins would be established as a WLA in the TMDL. The Regional Board estimated that the EPA would complete the TMDL by 2012. If one were not complete at that time, the WQBEL for dioxins would be 'no net loading,' or zero. These two alternative WQBEL's, the WLA or zero, are entirely consistent with the EPA's position in its letters of November 1999 and February 2000.

"The 2000 amendment also included provisions for compliance monitoring. In fact, the amended 2000 permit contained a 12-year schedule of compliance imposing detailed responsibilities on the Refinery. These requirements include preparation of a pollution prevention plan addressing dioxins, accelerated monitoring in the event that additional dioxins are discovered in the effluent, and participation in the San Francisco Bay Regional Monitoring Program which gathers data in support of the development of the TMDL. [Fn. omitted.]" (*CBE I, supra,* 109 Cal.App.4th at p. 1101.)

"For instance, the 2000 amendment provides: 'In the interim, until final WQBEL['s] are adopted, state and federal antibacksliding and antidegradation policies require that the Board retains effluent concentration limits from the Previous Order [the 1995 permit] to ensure that the waterbody will not be further degraded. In addition to interim concentration limits, interim performance-based mass limits are required to limit the discharge of [EPA-identified] pollutants to their current levels. These interim mass limits are based on recent discharge data. . . . Where pollutants have existing high detection limits [such as dioxins], interim mass limits are not required because meaningful performance-based limits cannot be calculated for those pollutants with non-detectable concentrations. However, [the Refinery is] required to investigate alternative analytical procedures that result in lower detection limits. . . . [The Refinery] will also be required to conduct a study

to investigate the feasibility and reliability of increasing sample size to reduce the detection limits for [dioxins].' " (*CBE I, supra,* 109 Cal.App.4th at p. 1101, fn. 8.)

## C. Procedural Background—Before the Prior Appeal

"[Appellants] appealed to the State Board from the Regional Board's orders reissuing and amending the 2000 permit. After an evidentiary hearing the State Board issued a lengthy decision largely upholding the orders of the Regional Board.

"The State Board described the issuance of the 2000 permit as *interim permitting*, a process whereby five-year NPDES permits are issued in the interim pending the preparation of a TMDL—which frequently takes much longer than the lifetime of the permit.

"The State Board noted that interim permitting 'can be problematic because if a water body is impaired, the water may not be able to assimilate more of the impairing pollutant. If this is the case, effluent limitations for the pollutant may be based solely on the applicable criterion or objective with no allowance for dilution. Hence, they may be extremely stringent. Ultimately, when the TMDL is done, the stringent limitations may become unnecessary because nonpoint source controls may provide assimilative capacity for the point source discharges[.] This may be especially true in cases where [as here] nonpoint pollutant sources are the primary contributors and point sources [such as the Refinery] are insignificant.'

"After considering the evidence, including expert testimony, the State Board concluded the Regional Board acted properly by imposing the performance-based effluent limitation and the schedule of compliance. The State Board noted that dioxins posed a problem that had to be solved on a regional level by creation of a TMDL. In the interim, the Refinery could comply with an effluent level consistent with its actual performance. The State Board pointed out the Refinery was not a significant source of dioxins: 'evidence in the record indicates that the dioxins . . . in [Waste 001] are due primarily to stormwater runoff.' And the Refinery had instituted measures resulting in an 85 percent reduction of dioxins discharged from the Clean Canal.

"The State Board agreed with the Regional Board's determination that dioxins from the Refinery's discharge—even though the dioxins entered the discharge waters from other sources—created a reasonable potential for causing or contributing to the exceeding of water quality standards. Thus, . . . a WQBEL was required in the NPDES permit. The State Board concluded:

'The Regional Board complied with the [CWA] because it did include water quality-based effluent limitations for all 17 dioxin[s] . . . in the permit findings. These limits will be based on a TMDL or on no net loading.' The State Board concluded the Regional Board properly imposed the performance-based interim effluent limitation under the circumstances of this case. The State Board also determined that the interim limit of 0.65 pg/L did not allow the Refinery to *increase* its discharges of dioxins." (*CBE I, supra,* 109 Cal.App.4th at pp. 1101–1102, boldface added.)

The State Board also rejected appellants' contentions regarding issues (2) and (3) of the present appeal. We will discuss the State Board's findings in more detail below. However, we note the State Board rejected appellants' contention that the 0.65 pg/L interim limit for dioxins "illegally backslides from the prior permit limit of 0.14 pg/L . . . ." The State Board also concluded the schedule of compliance for dioxins was valid, and that a 10-year compliance schedule was authorized by the 1995 basin plan.

In its disposition of appellants' appeal, the State Board "reduced the 12-year schedule of compliance to 10 years, to comply with the 1995 Basin Plan." (*CBE I, supra,* 109 Cal.App.4th at p. 1103.) The 1995 basin plan limits schedules of compliance to 10 years. As we noted in our prior opinion, "In all other [pertinent] respects . . . the State Board upheld the Regional Board." (*CBE I, supra,* 109 Cal.App.4th at p. 1103.)

"[Appellants] challenged the State Board's determination with a petition for writ of mandate filed in superior court. [Appellants] raised three issues: (1) that the amended 2000 permit violated the CWA and [a federal regulation] by failing to establish a WQBEL for dioxins; (2) that the permit violated the antibacksliding provisions of the CWA; and (3) that the permit schedule of compliance was invalid . . . .

"The superior court granted mandamus relief on issue (1), ruling that the amended 2000 permit 'does not contain a numeric WQBEL,' and thus violates [the federal regulation]. [¶] . . . [¶] The superior court did not reach issues (2) and (3) of the petition." (*CBE I, supra,* 109 Cal.App.4th at p. 1103.)

### D. Procedural Background—on Remand

The trial court filed a lengthy written opinion denying appellants' mandate petition on issues (2) and (3). The court noted that "[t]hree administrative agencies—the Regional Board, the State Board, and the [EPA]—all reviewed and approved the regulation of dioxins in the [Refinery's] permit." The court explicitly found "that the interpretations of these agencies, which are charged

with administering and implementing the NPDES permit program in California, are reasonable, and that the evidence in the administrative record supports the agencies' findings, analysis, and conclusions." Thus, the trial court found "that the permit's compliance schedule is legally adequate under the CWA and the implementing regulations, and that there is no violation of the CWA's 'antibacksliding' provisions."

## II. DISCUSSION

Appellants contend that the interim effluent limitation of 0.65 pg/L violates the CWA's antibacksliding provision, by allowing an increase in pollution over the prior limitation of 0.14 pg/L. Appellants further contend that the schedule of compliance in the Refinery's amended 2000 permit is invalid under the 1995 basin plan and the CWA. We disagree and determine that the superior court properly upheld the sound determinations of three highly expert administrative agencies.

■ "[O]ur standard of review must extend appropriate deference to the administrative agencies in this case, and their technical expertise. (See, e.g., *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 702 [166 Cal.Rptr. 331, 613 P.2d 579]; *WaterKeepers, supra,* 102 Cal.App.4th at pp. 1457–1458.) And while interpretation of a statute or regulation is ultimately a question of law, we must also defer to an administrative agency's interpretation of a statute or regulation involving its area of expertise, unless the interpretation flies in the face of the clear language and purpose of the interpreted provision. (See *Family Planning Associates Medical Group, Inc. v. Belshé* (1998) 62 Cal.App.4th 999, 1004 [73 Cal.Rptr.2d 221].)" (*CBE I, supra,* 109 Cal.App.4th at pp. 1103–1104.)

*Antibacksliding*

■ Issue (2) of the petition involves the antibacksliding rule. Generally, subsequent permit effluent limits that are comparable to earlier ones are not allowed to "backslide," i.e., be less stringent. The CWA's general prohibition on backsliding provides that "a permit may not be renewed, reissued, or modified . . . subsequent to the original issuance of such permit, to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit." (33 U.S.C. § 1342(o)(1).)

Appellants contend the interim effluent limitation of 0.65 pg/L violates the CWA's antibacksliding provision, by allowing an increase in pollution over the prior limitation of 0.14 pg/L. We disagree because, as the administrative agencies and the trial court found, the two effluent limitations are not comparable.

In approving the amended 2000 permit, the State Board found that "the antibacksliding rule does not apply to the interim limit in [the Refinery's] permit because that limit is not 'comparable' to the prior limit." "Rather, the appropriate comparison is between the final and alternative final limits reflected in the findings and the prior limit of 0.14 pg/[L]. The [Refinery] permit findings state that the final limits will be based either on a TMDL or on no net loading [fn. omitted]. Both limits are water quality-based, as is the prior limit. The interim limit is not; it is performance-based. The interim limit is intended to preserve the status quo during the compliance schedule term, rather than to implement the applicable standard."

The State Board noted that the EPA agreed with these findings, citing a June 19, 2000 letter from the Director of the EPA's Region IX Water Division. The EPA director writes: "[T]he interim limits on the dioxin . . . should assure the discharge does not increase its loading of dioxins to the [San Francisco B]ay. Furthermore, because the final [WQBEL] will either be set in accordance with a TMDL, or, in the absence of a TMDL, will be 'no net loading[,]' which is more stringent than the current limit of 0.14 pg/[L,] we believe that revising this limit does not violate the antibacksliding provisions of . . . the [CWA]."

The State Board concurred with EPA's position: "The no net loading limit for 2,3,7,8-TCDD is more stringent than the prior limit and, thus, does not backslide."

In rejecting appellants' antibacksliding argument, the trial court agreed with the State Board that the final limit of 0.14 pg/L was not comparable to the interim limit of 0.65 pg/L. "[T]he proper comparison is between the new final limits and [the] previous final limits that they replace. The Court finds that this interpretation is reasonable and does not conflict with the language and purpose of the CWA's antibacksliding provisions."

 The administrative agencies in this case, including the EPA, determined that the proper effluent limits to compare for antibacksliding purposes are the two final limits, 0.14 pg/L and the ultimate limit, which will either be TMDL-based or no net loading. The interim limit of 0.65 pg/L simply does not compare, because that is a performance-based, not water quality-based, limit designed to preserve the status quo pending proper, and basin-wide, study of the problem of alleviating dioxin pollution. We cannot find the agencies' interpretation unreasonable.[6]

---

[6] *Citizens For A Better Environment v. Union Oil Co.* (9th Cir. 1996) 83 F.3d 1111 (*Union Oil*), on which appellants rely, does not dictate a contrary conclusion. Any language in that case which could be construed to support appellants' position is not entirely precise, taken out of context, and is dicta. (See *id.* at p. 1120.)

The trial court properly determined the effluent limitation of the amended 2000 permit did not violate the antibacksliding petition, and thus the court properly ruled against appellants on issue (2) of their petition.

*Schedule of Compliance*

Issue (3) involves challenges to the Refinery's amended 2000 permit's schedule of compliance, which plays a significant role in this case due to the Regional and State Board's TMDL-based approach to dioxin effluent limitations. Portions of our prior opinion help describe the purpose of the schedule of compliance.

"[T]he Regional and State Boards deferred the determination of effluent limitations to the future completion of a TMDL, and did not establish current limitations. We note that this is not the typical case of a point-source polluter significantly contributing to toxic concentrations in a water body. It is undisputed the Refinery is not the primary source of the dioxins in Suisun Bay, but the dioxins in fact come from other sources, including the forces of nature, beyond the Refinery's control. The goal of which we should not lose sight is a bay environment free of harmful dioxins from all sources, attainable through a comprehensive TMDL." (*CBE I, supra,* 109 Cal.App.4th at pp. 1105–1106.)

"The Regional and State Boards concluded the problem of dioxins had to be addressed comprehensively at a regional level, by the completion of a TMDL. To be an effective TMDL the source analysis must identify the amount, timing, and each point of origin of the dioxins contaminating the Bay. The allocation element of a TMDL assesses responsibilities, identifies specific actions to be taken by identified parties, and results in an allocation of the total allowable pollutant burden. The sum of individual allocations should equal the total allowable pollutant burden [fn. omitted]. Achievement of harm-free levels of dioxins involves not only oversight of the Refinery, but also other sources of origin. The TMDL will impose an effluent limitation that will protect the Bay from all sources, which will necessarily include any dioxins controllable by Tesoro." (*CBE I, supra,* 109 Cal.App.4th at p. 1106.)

"In the interim the Refinery, through a schedule of compliance, was allowed to discharge only at current levels, which are not a significant source of the Suisun Bay dioxin problem. At the conclusion of the TMDL preparation period, during which the refinery must comply with a rigorous schedule of compliance, the refinery will have to either (1) comply with the dioxin WLA in the completed TMDL or (2) reduce dioxin discharge to zero. These two limitations, effluent limitations based on water quality standards, qualify as WQBEL's in the 2000 amended permit. Title 33 United States Code

section 1362(11) includes 'schedules of compliance' within its definition of the term 'effluent limitation.' Section 1362(17) explains that a schedule of compliance 'means a schedule of remedial measures including an enforceable sequence of actions or operations leading to compliance with an effluent limitation, . . .' Title 40 Code of Federal Regulations part 130.0 (1985) explains that the process of water quality planning and management is jointly implemented by the EPA, the states, interstate agencies, and areawide, local, and regional planning organizations. 'This process is a dynamic one, in which requirements and emphases vary over time.' (40 C.F.R. § 130.0(e) (2001).)" (*CBE I, supra,* 109 Cal.App.4th at pp. 1106–1107.)

Appellants raise four challenges to the validity of the Refinery permit's schedule of compliance.

1.

Appellants contend the schedule of compliance is not authorized by the 1995 basin plan. Appellants argue that the 1995 basin plan only allows schedules of compliance for "newly adopted objectives or standards," but the narrative toxicity standard for the San Francisco Bay Basin was adopted 20 years earlier, in 1975.[7] Appellants conclude the schedule of compliance is invalid because it implements a 1975 standard, not a newly adopted one. We disagree.

As the trial court noted, the State Board rejected this contention. The State Board, taking a broader, more pragmatic view, reasoned that the language of the 1995 basin plan "can reasonably be construed to authorize compliance schedules for new interpretations of existing standards. [Fn. omitted.]" The State Board found that in 2000 the Regional Board "newly interpreted the narrative toxicity objective for 2,3,7,8-TCDD equivalents. Under the latest interpretation, final [WQBEL's] will be based on a TMDL or, alternatively, on no net loading."

In the words of the trial court, "The State Board explained that this new interpretation of the basin plan's narrative toxicity standard, which resulted in the development of new effluent limits for dioxins, was justified for a number of reasons—including the 1998 listing of Suisun Bay as impaired for dioxins; the evidence indicating that dioxins are ubiquitous in the environment and result primarily from aerial emissions; and the recognition that solving the dioxin problem will require a regional, multi-media approach that is well suited to the TMDL process."

---

[7] The narrative standard reads as follows: "All waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms."

In reaching this conclusion, the State Board relied on the EPA's 1994 Whole Effluent Toxicity (*WET*) *Control Policy* (WET Policy). The WET Policy expresses what the trial court called "EPA's long-held position that compliance schedules are authorized under the CWA where the State adopts a new or revised interpretation of an existing water quality standard, and where the applicable State water quality standards expressly allow for compliance schedules."

 Three separate administrative agencies, the Regional Board, the State Board, and the EPA, approved the schedule of compliance. The schedule was imposed based on the State Board's interpretation of the 1995 basin plan. As we noted in our prior opinion: "Generally, we extend considerable deference to an administrative agency's interpretation of its own regulations or the regulatory scheme which the agency implements or enforces. The agency interpretation is entitled to great weight unless unauthorized or clearly erroneous. (See, e.g., *Californians for Political Reform Foundation v. Fair Political Practices Com.* (1998) 61 Cal.App.4th 472, 484 [71 Cal.Rptr.2d 606]; *Calderon v. Anderson* (1996) 45 Cal.App.4th 607, 613 [52 Cal.Rptr.2d 846].) The factors governing the degree of judicial deference to agency interpretations are set forth in *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*). These factors include the court's assumption that the agency has the technical knowledge and expertise to interpret complex regulations in a technical or complex scheme. They also include the likelihood that agency officials have reached the interpretation after careful and studied review and input from the public. (See *Yamaha, supra,* at pp. 12–13.)" (*CBE I, supra,* 109 Cal.App.4th at p. 1107.)

The trial court properly upheld the State Board's conclusion that the 1995 basin plan authorizes the schedule of compliance in the Refinery's amended 2000 permit.

2.

 Appellants contend that the schedule of compliance violates the CWA. The provision of the CWA pertinent here, title 33 of the United States Code section 1311, deals with effluent limitations.[8] In subdivision (b) of section 1311, Congress set forth a "[t]imetable for achievement of objectives." Subdivision (b)(1)(A) and (C) of section 1311 provided that certain effluent limitations, mainly those requiring the application of the best practicable control technology currently available, must be achieved by July 1, 1977.

---

[8] Subsequent statutory citations are to title 33 of the United States Code, unless otherwise indicated.

The provision most pertinent to appellants' argument, section 1311(b)(1)(C), provides for the achievement "not later than July 1, 1977" of "any more stringent limitation[s], including those necessary to meet water quality standards, treatment standards, or schedules of compliance" established pursuant to state or federal law "or required to implement any applicable water quality standard established pursuant to" the CWA.

Appellants note that the basin plan's narrative toxicity standard was issued in 1975, and thus before the deadline of section 1311(b)(1)(C). Appellants then refer to the 1975 standard as a "pre-1977 water quality objective," and argue that the CWA "does not authorize the use of compliance schedules . . . for effluent limitations implementing water quality objectives enacted prior to July 1, 1977." Essentially, as the State Board points out, appellants characterize July 1, 1977, as a congressional deadline for compliance with effluent limitations. Appellants then argue that the amended 2000 permit cannot employ a schedule of compliance to *defer* "compliance with a WQBEL implementing that pre-July 1977 objective"—that is, we presume, by ignoring the congressional deadline for compliance or extending compliance beyond July 1, 1977.

As noted with regard to the previous contention, the EPA has long taken the view that a schedule of compliance is authorized in the case of a revision or reinterpretation of an existing water quality standard. The EPA has taken that view in the context of pre-July 1977 water quality standards or objectives. The WET Policy states: "Most State narrative water quality criteria for toxicity were adopted before July 1, 1977. Where this is the case, the permitting authority can only allow a schedule of compliance in the NPDES permit *where the State has made a new or revised interpretation of the applicable narrative water quality criterion after July 1, 1977.*" (Italics added.)

The State Board notably relied on the WET Policy when approving the schedule of compliance. The trial court found the State Board's approval was reasonable. In particular, the court noted that "the [p]ermit's final dioxin limits are based on a new interpretation of the Basin Plan's narrative toxicity standard, and the Basin Plan (the applicable State water quality standard for San Francisco Bay) explicitly authorizes schedules of compliance." Thus, the schedule of compliance does not violate CWA because it involves a new interpretation of a pre-July 1, 1977 water quality standard.[9]

---

[9] Appellants present no apposite authority to the contrary. Their claim that the WET Policy is contrary to law is incorrect. The CWA explicitly allows for schedules of compliance for new or revised water quality standards. (§ 1313(e)(3)(F).)

 We have stated, above, the need for our deference to the expertise of administrative agencies and their interpretations of the regulations they implement or enforce. Appellants argue we should not extend such deference to reliance on the WET Policy, because that policy is (supposedly) an informal guidance document. But "[c]ogent" informal administrative interpretations "'nevertheless warrant respect.' [Citation.]" (*Alaska Dept. of Environmental Conservation v. EPA* (2004) 540 U.S. 461, 488 [157 L.Ed.2d 967, 124 S.Ct. 983], quoting *Washington State Dept. of Social and Health Servs. v. Guardianship Estate of Keffeler* (2003) 537 U.S. 371, 385 [154 L.Ed.2d 972, 123 S.Ct. 1017].)

### 3.

Appellants argue the 10-year schedule of compliance in the amended 2000 permit is invalid because schedules of compliance are limited to five years, the term of an NPDES permit. The trial court properly rejected this argument, concluding that a schedule of compliance can have a life longer that its corresponding permit.

As the trial court noted, the basin plan authorizes a 10-year schedule of compliance. So do the applicable EPA regulations, which state that "If a schedule of compliance exceeds the term of a permit, interim permit limits effective during the permit shall be included in the permit and addressed in the permit's fact sheet or statement of basis. The administrative record for the permit shall reflect final permit limits and final compliance dates. . . ." (40 C.F.R. § 131.38(e)(7) (2004).) And, again as the trial court noted, "the CWA's compliance schedule provisions do not limit the duration of a compliance schedule to a five-year period. [Citations.]"

Appellants' reliance on *Union Oil, supra,* 83 F.3d 1111, is misplaced. *Union Oil* involved a seven-year schedule of compliance included in a cease-and-desist order (CDO) in an enforcement action. (*Id.* at p. 1114.) The issue was whether, under the facts and procedural background of that case, the CDO worked a modification of the NPDES permit without going through the appropriate modification procedures. (*Id.* at pp. 1119–1120.) *Union Oil* is inapposite to the issue raised here.

The trial court properly found the schedule of compliance could exceed five years.[10]

---

[10] We see no merit in appellants' claim that a schedule of compliance that exceeds a permit term somehow impairs public participation in the permit process.

## 4.

Finally, appellants argue the schedule of compliance is invalid because it does not fit the "statutory and regulatory definitions of 'schedule of compliance.'" Essentially, appellants argue that a 10-year compliance schedule does not meet these definitions because it extends beyond the lifetime of the five-year permit. Appellants suggest that the schedule is unenforceable after the permit's expiration.

The CWA defines a schedule of compliance as "a schedule of remedial measures including an enforceable sequence of actions or operations leading to compliance with an effluent limitation, other limitation, prohibition, or standard." (§ 1362(17).) The pertinent federal regulations define a schedule of compliance as "a schedule of remedial measures included in a 'permit,' including an enforceable sequence of interim requirements (for example, actions, operations, or milestone events) leading to compliance with the CWA and regulations." (40 C.F.R. § 122.2 (2004).)

As we have noted, there is no prohibition on a schedule of compliance extending beyond the expiration date of an NPDES permit. In fact, such an extension is explicitly authorized. The definitions of schedule of compliance do not change this. And nothing indicated that the schedule would be unenforceable, especially since the polluter would have to renew the expired permit in any event—and nothing indicates the extended schedule of compliance is legally ineffective after the expiration of the original permit.

We agree with this reasoning of the trial court: "The compliance schedule is appropriately included within the permit, it contains an enforceable interim limit for dioxins that the Refinery must comply with, it contains special requirements relating to the study and monitoring of dioxins, and it leads to ultimate compliance with the final dioxin limits, which are valid WQBEL['s] under the CWA. [Appellants] have failed to show that the [p]ermit's compliance schedule does not meet the CWA's definition of a compliance schedule. [Citation.]"

The trial court correctly rejected appellants' four challenges to the validity of the schedule of compliance, and thus properly ruled against appellants on issue (3) of their mandate petition.

We emphasize again the role of the administrative agencies in this case and their technical expertise—and the due deference we must extend to their reasoned conclusions supported by the record.

---

## III. DISPOSITION

The judgment denying the petition for writ of mandate on the second and third issues of the petition is affirmed. Each party shall bear its own costs of this appeal.

Swager, J., and Margulies, J., concurred.

On September 27, 2005, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied December 21, 2005. Kennard, J., did not participate therein.